# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 15, 2019     Decided February 16, 2021
Reargued April 17, 2020

No. 17-1246

JOE FLEMING, INDIVIDUALLY, AND AS JOE FLEMING STABLES,
PETITIONER

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,
RESPONDENT

Consolidated with 17-1249, 17-1250

On Petitions for Review from Orders of the
United States Department of Agriculture

*David Broiles* argued the cause for petitioners. With him on the brief was *Karin Cagle*.

*Ilya Shapiro* was on the brief for *amicus curiae* Cato Institute in support of petitioners.

*Michael Pepson* and *R. James Valvo, III* were on the brief for *amicus curiae* Americans for Prosperity Foundation in support of petitioners.

*Aditya Dynar* was on the brief for *amicus curiae* The New Civil Liberties Alliance in support of petitioners.

*Hashim M. Mooppan*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Mark R. Freeman*, *Mark B. Stern*, *Joshua M. Salzman*, *Daniel Aguilar*, and *Amanda L. Mundell*, Attorneys.

*Pratik A. Shah*, appointed by the court, argued the cause as *amicus curiae*. With him on the briefs were *Z.W. Julius Chen*, and *Rachel Bayefsky.*

*Alan B. Morrison* and *Richard J. Pierce, Jr.* were on the brief for *amici curiae* Alan B. Morrison et al., in support of appointed amicus curiae.

*Robert J. Lesnick* was on the brief for *amicus curiae* The Federal Administrative Law Judges Conference in support of appointed amicus curiae.

*Danette L. Walker (Mincey)* was on the brief for *amicus curiae* Association of Administrative Law Judges in support of appointed amicus curiae.

*Marilyn Dixon Zahm* was on the brief for *amicus curiae* SSA ALJ Collective in support of appointed amicus curiae.

Before: SRINIVASAN, *Chief Judge*, and KATSAS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* RAO.

SRINIVASAN, *Chief Judge*: The petitions for review in these cases ask us to set aside decisions of the Department of Agriculture imposing sanctions on petitioners for violating the Horse Protection Act, 15 U.S.C. § 1821 *et seq*. After the petitions for review were filed, the Supreme Court decided *Lucia v. SEC*, 138 S. Ct. 2044 (2018), holding that the SEC's administrative law judges (ALJs) had not been appointed in compliance with the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. In light of *Lucia*, the government agrees with petitioners that the ALJ who presided over petitioners' cases was improperly appointed. The government moves for vacatur of the challenged orders and remand for new proceedings before constitutionally appointed ALJs.

Petitioners, however, oppose the government's motion, urging us first to address a number of additional challenges they advance. While we consider and reject one of those additional claims, we cannot consider another of the arguments because petitioners failed to present it before the agency, and we decline to consider the remaining ones in the present posture. We therefore grant the petitions for review and remand these cases so that petitioners may have new administrative hearings before validly appointed ALJs.

I.

A.

The Horse Protection Act, 15 U.S.C. § 1821 *et seq.*, imposes penalties on persons who enter a "sore" horse into shows or auctions. "Soring" refers to the practice of intentionally injuring a horse's forelimbs so that it will quickly lift its feet as a result of the pain, inducing it to walk with a high-stepping gait considered desirable for shows and

exhibitions. *See Thornton v. USDA*, 715 F.2d 1508, 1510 (11th Cir. 1983). The Horse Protection Act forbids the practice of soring in order to prevent animal cruelty and protect the industry. *See id.* Any person who knowingly shows or exhibits a sore horse faces criminal and civil penalties, including temporary disqualification from shows and exhibitions. 15 U.S.C. § 1825(a)(1), (b)(1), (c).

The Department of Agriculture enforces the Horse Protection Act. The Department begins enforcement proceedings under the Act (and other statutes it administers) by filing an administrative complaint against suspected violators. *See* 7 C.F.R. §§ 1.131, 1.133(b)(1). The proceeding is then assigned to an ALJ within the agency. *Id.* § 1.132. A respondent served with a complaint has twenty days to file an answer. *Id.* § 1.136(a). If no answer is filed, the ALJ may enter a default order. *See id.* §§ 1.136(c), 1.139. If an answer is filed, the ALJ holds a hearing and issues a decision. *Id.* §§ 1.141, 1.142.

Parties can appeal the ALJ's decision to a Department officer known as the Judicial Officer. *Id.* § 1.145(a). The Judicial Officer, exercising authority delegated by the Secretary of Agriculture, acts as the agency's final adjudicator. *Id.* § 2.35(a). The Judicial Officer reviews the record and the parties' briefs, presides over any oral argument, and issues a final decision for the Department. *Id.* §§ 1.145, 2.35(a). By regulation, only decisions of the Judicial Officer are "final for purposes of judicial review." *Id.* §§ 1.139, 1.142(c)(4).

## B.

In 2017, the Department filed an administrative complaint against petitioners Jarrett Bradley, Joe Fleming, and Sam Perkins, alleging that each of them had entered sored horses

into competition in violation of the Horse Protection Act. No petitioner filed a timely answer to the complaint against him, and the agency moved for default orders in each case. Petitioners then filed objections to the motions for default. Among petitioners' arguments, they contended that the presiding ALJ qualified as an "Officer[] of the United States" for purposes of the Constitution's Appointments Clause, U.S. Const. art. II, § 2, cl. 2, and had not been appointed in compliance with the Clause. Without addressing that argument, the ALJ entered the requested default orders, assessing civil monetary penalties and temporarily disqualifying petitioners from participating in horse shows or exhibitions.

Petitioners appealed to the Judicial Officer, renewing their contention that the ALJ had been improperly appointed. Petitioners additionally argued that the Judicial Officer's own appointment was invalid under the Appointments Clause. The Judicial Officer declined to rule on the Appointments Clause challenge to the ALJ, finding that it "should be raised in an appropriate United States Court of Appeals." *Joe Fleming*, 76 Agric. Dec. 532, 535 (2017). With regard to the constitutionality of his own appointment, the Judicial Officer concluded that he had been lawfully appointed. *Id.* at 538. After rejecting petitioners' remaining arguments, the Judicial Officer affirmed the default orders. Petitioners then sought review in our court.

## C.

While the petitions for review were pending, the Supreme Court decided *Lucia v. SEC*, 138 S. Ct. 2044 (2018). *Lucia* considered whether ALJs working in the Securities and Exchange Commission had been appointed in violation of the Appointments Clause. *Id.* at 2051. For purposes of the Clause,

federal workers fall into three categories: (i) principal officers, who must be appointed by the President with the advice and consent of the Senate; (ii) inferior officers, who can be appointed by the President, the head of a department, or a court of law; and (iii) non-officer employees, whose appointments are unaddressed (and thus unconstrained) by the Clause. *See id.* at 2051 & n.3. *Lucia* held that the ALJ in that case was an officer rather than an employee, and that his appointment was invalid because he had not been appointed by the President, a department head, or a court of law. *Id.* at 2055. The Court vacated the ALJ's order and remanded for proceedings before a properly appointed ALJ. *Id.* at 2055.

After *Lucia*, the government conceded that the ALJ who had decided petitioners' cases was, as petitioners argued, an inferior officer who had been improperly appointed. The government thus moved our court to impose the same remedy ordered in *Lucia*: vacatur of the challenged orders and remand for new hearings before a different, properly appointed ALJ.

Petitioners, however, oppose the government's motion, urging us to address a number of additional arguments before any remand. Specifically, petitioners argue, as they did before the Judicial Officer, that (i) the Judicial Officer, appointed as an inferior officer, is in fact a principal officer; (ii) the Department's ALJs also are principal officers, not just inferior officers as is now conceded by the government; and (iii) the Department lacked authority under the Horse Protection Act to disqualify petitioners from entering horses in shows and exhibitions. Petitioners also advance a new argument they have not previously raised: the Department's ALJs enjoy dual layers of "for-cause" protection against their removal, 5 U.S.C. §§ 1202(d), 7521, and those dual layers of protection unconstitutionally constrain the President's removal power

under the Supreme Court's decision in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 492 (2010).

The government argues that we should decline to address petitioners' additional arguments and should do no more than grant them relief based on *Lucia*. With regard to petitioners' new argument that the dual layers of for-cause-removal protections for ALJs are unconstitutional under *Free Enterprise*, the government contends that we cannot consider the argument because petitioners failed to raise it before the agency. If we were to reach the merits of that issue, the government submits that we should adopt a narrowing construction of one of the applicable layers of removal protections, *see* 5 U.S.C. § 7521, to avoid serious constitutional concerns. Petitioners, for their part, urge us to reject the government's proposed narrowing construction and declare the dual for-cause-removal protections unconstitutional.

Thus, no party takes the position that the dual protections would be valid under *Free Enterprise* without adopting the government's narrowing construction. Yet *Free Enterprise* left open whether its holding applies to the dual layers of for-cause protections for ALJs. *See Free Enterprise Fund*, 561 U.S. at 507 n.10; *see also Lucia*, 138 S. Ct. at 2060–61 (Breyer, J., concurring in the judgment in part and dissenting in part). To ensure full consideration of that issue, we requested supplemental briefing from the parties and appointed an amicus curiae to argue that the dual layers of for-cause protections for the Department's ALJs are constitutional even if the government's narrowing construction were rejected.[*] In the supplemental briefing, the government reiterated and

---

[*] The court thanks court-appointed *amicus curiae* Pratik A. Shah, aided by Z.W. Julius Chen and Rachel Bayefsky, for their assistance in presenting this case.

elaborated on its view that petitioners' forfeiture of that issue before the agency means that we cannot consider it.

We are ultimately persuaded by the government's position in that regard: petitioners did not raise the dual for-cause-removal issue before the agency, and we are powerless to excuse the forfeiture. We also decline to address the other additional arguments petitioners ask us to consider, except we reject their contention that the Department's ALJs are principal officers. Petitioners of course remain free to raise any of the unaddressed arguments in the proceedings on remand.

## II.

We begin with petitioners' argument that the dual layers of for-cause-removal protections for the Department's ALJs unconstitutionally limit the President's removal power under *Free Enterprise*. As the government has maintained from the outset, petitioners did not raise that issue before the ALJ or the Judicial Officer. The argument thus was forfeited before the agency. Petitioners ask us to excuse the forfeiture and address the argument because it presents a structural constitutional objection. *See, e.g.*, *Freytag v. Commissioner*, 501 U.S. 868, 878–79 (1991). We have no power to do so. Petitioners' argument is subject to a mandatory, non-excusable, issue-exhaustion requirement imposed by statute, and we therefore cannot consider the claim.

By way of overview, our analysis proceeds as follows. The statute governing judicial review of the Department's adjudications expressly requires exhaustion of "all administrative appeal procedures established by the [agency]." 7 U.S.C. § 6912(e). That provision imposes a mandatory exhaustion rule, such that a court cannot excuse a party's failure to exhaust, no matter the reason. And one of the

"administrative appeal procedures" the Secretary has established is a requirement to raise each issue in an appeal before the Judicial Officer.  The upshot is that the statute and regulatory procedures require litigants to exhaust issues before the agency and forbid us from excusing any failure to do so.  We thus lack the power to consider petitioners' unexhausted argument that, under *Free Enterprise*, the Department's ALJs are unduly insulated from the President's authority to remove them from office.

*First*, section 6912(e) establishes a mandatory exhaustion requirement, leaving courts with no room to excuse a party's failure to exhaust.  As the Supreme Court has recently made clear, "courts have a role in creating exceptions" to a statutory exhaustion provision "only if Congress wants them to." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).  "For that reason, mandatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion" to excuse the failure to exhaust, *id.*, even under "standard administrative-law exceptions" such as futility or hardship, *id.* at 1858 n.2.  Although judge-made exceptions of that kind are available in the case of a judge-made exhaustion obligation, when an exhaustion requirement is imposed by statute, the only question is whether *Congress* intended any "limits on a [litigant's] obligation to exhaust." *Id.* at 1856.

Congress did not intend any such limits under section 6912(e).  The Supreme Court's decision in *Ross* makes that clear.  *Ross* considered the Prison Litigation Reform Act's exhaustion requirement, which provides in relevant part that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). The Court concluded that the statute's "mandatory language means a court may not excuse a failure to exhaust."

*Ross*, 136 S. Ct. at 1856. The sole exception, the Court noted, would be if a prisoner could show, per the terms of the statute itself, that administrative remedies were not "available." *Id.* at 1858–59.

The language of section 6912(e) is equally mandatory and equally "rigorous." *Id.* at 1857. Just as section 1997e(a) states that "[n]o action shall be brought . . . until" administrative remedies are exhausted, section 6912(e) provides that, "before [a] person may bring an action," she "shall exhaust all administrative appeal procedures established by the Secretary." If section 1997e(a) admits of no exception (other than the textual qualifier that remedies must be "available"), then section 6912(e) too admits of no exception. Indeed, we have already stated that "the language of [section] 6912(e) is very similar to" section 1997e(a). *Munsell v. USDA*, 509 F.3d 572, 580 (D.C. Cir. 2007). In *Munsell*, we held that section 6912(e) imposes a "mandatory, but nonjurisdictional [exhaustion] requirement," *id.* at 581, including for "constitutional claims," *id.* at 592. Although we had no occasion to decide whether section 6912(e)'s exhaustion rule could be subject to any court-made exception, *see id.* at 579, the answer must be no after *Ross*.

According to petitioners, *Munsell*'s statement that section 6912(e) is "nonjurisdictional" means that courts retain the ability to excuse a failure to exhaust. That is incorrect. The Supreme Court's intervening decision in *Ross* clarified that even nonjurisdictional exhaustion requirements—such as sections 1997e(a) or 6912(e)—forbid judges from excusing non-exhaustion. To be clear, there is still a material difference between jurisdictional exhaustion requirements and nonjurisdictional, mandatory requirements. A court must enforce a jurisdictional requirement even if no party raises the failure to exhaust. *See Union Pac. R.R. Co. v. Bhd. of*

*Locomotive Eng'rs*, 558 U.S. 67, 82 (2009). By contrast, a nonjurisdictional, mandatory exhaustion requirement functions as an affirmative defense, and thus can be waived or forfeited by the government's failure to raise it. *See id.*; *Jones v. Bock*, 549 U.S. 199, 212 (2007). But if the government raises the exhaustion requirement, the court must enforce it. That is the case here.

Petitioners also claim that *Munsell* recognized a futility exception to section 6912(e)'s exhaustion mandate. In disposing of the appellant's claim in *Munsell*, the court stated that, because "the complaint and affidavits [could not] reasonably be construed to indicate that it would have been futile for Munsell . . . to pursue their administrative appeals on their constitutional claims . . . , [Munsell's] failure to exhaust their administrative remedies is dispositive." 509 F.3d at 592. That statement, however, only assumed the existence of a futility exception without deciding the matter, and offered no reasoning or precedent justifying the assumption. *See id.* Elsewhere in the opinion, the court stated that it had no "need [to] decide whether the 'well established exemptions' to nonjurisdictional exhaustion requirements apply to § 6912(e)." *Id.* at 579 (quoting *Woodford v. Ngo*, 548 U.S. 81, 126 (2006) (Breyer, J., concurring in the judgment)). *Munsell* thus does not stand in the way of our conclusion that section 6912(e) leaves no latitude for judges to excuse non-exhaustion. And *Ross* compels that conclusion.

*Second*, section 6912(e)'s non-excusable exhaustion requirement includes a requirement to raise an issue before the Judicial Officer in order to preserve it for judicial review. In *Woodford v. Ngo*, 548 U.S. 81 (2006), the Supreme Court held that section 1997e(a) (the exhaustion provision considered in *Ross*) requires "proper exhaustion"—i.e., "using all steps that the agency holds out, and doing so *properly* (so that the agency

addresses the issue on the merits).” *Id.* at 90 (internal quotation marks omitted). The Court explained: “Proper exhaustion demands compliance with an agency’s deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.” *Id.* at 90–91. The Court specifically contemplated that agency issue-preservation rules fit within the requirements for “proper exhaustion,” reasoning that “courts should not topple over administrative decisions unless the administrative body not only has erred, *but has erred against objection made at the time appropriate under its practice*.” *Id.* at 90 (internal quotation marks omitted); *see id.* (proper exhaustion enables an agency to “address[] the issue on the merits”). Again, we find no basis for distinguishing section 1997e(a), which requires exhausting “such administrative remedies as are available,” from the statute at issue here, which requires exhausting “administrative appeal procedures.” If anything, the case for proper exhaustion is even stronger with section 6912(e), which does not require that administrative appeal procedures be “available.”

Several Department regulations, considered in combination, establish the requirement to preserve individual issues before the Judicial Officer. *Cf. Sims v. Apfel*, 530 U.S. 103, 108 (2000) (“[I]t is common for an agency’s regulations to require issue exhaustion in administrative appeals.”). To begin with, 7 C.F.R. § 1.145(a) requires that “[e]ach issue set forth in the appeal petition [to the Judicial Officer] and the arguments regarding each issue . . . shall be plainly and concisely stated.” Section 1.145(b) then allows other parties to the proceeding to raise “any relevant issue . . . not presented in the appeal petition.” *Id.* § 1.145(b). And section 1.145(e) states that the “[a]rgument to be heard on appeal, whether oral or on brief, shall be limited to the issues raised in the appeal or in the response to the appeal.” *Id.* § 1.145(e). The regulations

link those requirements for proper exhaustion to judicial review by conditioning "judicial review" on bringing an appeal before the Judicial Officer. *Id.* §§ 1.139, 1.142(c)(4).

Together, those regulations require that all arguments be timely presented to the Judicial Officer, and they empower her to impose forfeiture as to arguments not timely presented. Thus, if a party raises a new issue at oral argument before the Judicial Officer, she may rule against the party on forfeiture grounds, even if the forfeited argument makes clear that the ALJ's decision is erroneous.

Our consideration of unpreserved issues would frustrate that scheme. In *Woodford*, the Supreme Court held that raising issues in an untimely administrative appeal was not proper exhaustion and thus did not preserve those issues for judicial review. The forfeiture here is even more pronounced, for petitioners never gave the Judicial Officer *any* opportunity to consider the issue they now seek to press. On deferential review under the APA, *see* 5 U.S.C. § 706, we could not conclude that a decision by the Judicial Officer was arbitrary and capricious in failing to identify, raise, and resolve *sua sponte* an issue never presented to her. Put differently, "[i]f a party flouts [agency] regulation[s] by failing to raise with the [agency] an issue that the party asserts in court, the court generally has no basis for 'setting aside' the [agency's] order (even assuming the administrative law judge erred)." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 750 (6th Cir. 2019) (quoting 33 U.S.C. § 921(c)). Read against section 6912(e) and the background rule of proper exhaustion, the Department's regulations thus required petitioners to exhaust specific issues before the Judicial Officer as a prerequisite to judicial review.

Our court has interpreted similar sets of regulations to require petitioners to "afford [an agency] an opportunity to pass

on [a particular issue] before seeking judicial review." *Vermont Dep't of Pub. Serv. v. United States*, 684 F.3d 149, 157 (D.C. Cir. 2012). In *Vermont*, we considered Nuclear Regulatory Commission regulations obligating parties to (i) petition for Commission review "before seeking judicial review of an agency action" and (ii) provide a "concise statement why in the petitioner's view the [challenged] action is erroneous." *Id.* (citing 10 C.F.R. §§ 2.1212, 2.341(b)(2)(iii)). *Vermont* relied on an earlier decision from our court, *Environmentel, LLC v. FCC*, which had also interpreted materially identical regulations to impose an issue-exhaustion requirement. *See* 661 F.3d 80, 83–84 (D.C. Cir. 2011) (citing 47 C.F.R. § 1.115(a), 1.115(b)(1)). To the same effect, the Supreme Court's decision in *Sims v. Apfel* cited a rule requiring petitioners to the Labor Benefits Review Board to "list[] the specific issues to be considered on appeal" as a typical example of "an agency's regulations [that] require issue exhaustion in administrative appeals." 530 U.S. at 108 (quoting 20 C.F.R. § 802.211(a)). These precedents make clear that the requirement in 7 C.F.R. § 1.145(a) to set forth "each issue . . . plainly and concisely" in an appeal petition to the Judicial Officer, together with the associated regulations enumerated above, mandate issue exhaustion.

Summing up the above two points, section 6912(e) requires parties to properly "exhaust all administrative appeal procedures established by the Secretary," and one such "administrative appeal procedure" is a requirement that parties raise an issue before the Judicial Officer. Section 6912(e) thus incorporates the Department of Agriculture's internal appeal rules, which have included a requirement to raise individual issues before the Judicial Officer since well before the statute's enactment.

To be sure, 7 C.F.R. § 1.145(e) allows the Judicial Officer to determine, *sua sponte*, "that additional issues should be argued" to her even if not raised by the parties. But that regulatory grant of discretion to the Judicial Officer does not confer like authority on us. As explained, if the Judicial Officer had rejected an argument on the ground that it was raised to her out of time—thereby declining to exercise her discretion to excuse a forfeiture—we could not set aside her decision as arbitrary just because we found the forfeited argument persuasive on the merits. And we certainly could not conclude that the Judicial Officer acted arbitrarily in failing to identify and consider an issue never presented to her. As a result, the fact that the Judicial Officer *could* have considered the dual for-cause-removal issue below, despite petitioners' failure to raise it, does not mean that we can similarly choose to address it.

It follows that we have no discretion to excuse petitioners' failure to raise before the agency their dual for-cause-removal claim. The statute leaves no room for us to disregard petitioners' noncompliance with its mandatory obligation to exhaust the agency's administrative-appeal procedures, including the regulations' issue-exhaustion requirement. Petitioners, though, can press their unexhausted claim in the proceedings before the agency on remand.

Our dissenting colleague agrees that, insofar as the agency's regulations require issue exhaustion, the statute incorporates that requirement as a mandatory one. Dissenting Op. 6. In her view, however, the regulations do not establish an issue-exhaustion requirement. But the pertinent regulations, as explained, *see* pp. 13–14, *supra*, are materially indistinguishable from ones held by our court to require issue exhaustion. *See Vermont*, 684 F.3d at 157; *Environmentel*, 661 F.3d at 84; *see also Sims*, 530 U.S. at 108 (citing 20 C.F.R. § 802.211(a)).

Our colleague further submits that we should forgo requiring issue exhaustion for either of two reasons: (i) the unexhausted dual for-cause-removal claim involves a structural constitutional issue, or (ii) judicial estoppel principles weigh against enforcing issue exhaustion in the circumstances of this case. Dissenting Op. 10–16. The statute and incorporated regulations, however, do not contemplate any exception to the mandatory issue-exhaustion requirement for either of those reasons. And there is no "judicial discretion" to consider an unexhausted claim when facing a "mandatory exhaustion regime[]." *Ross*, 136 S. Ct. at 1857. As a result, even if the Supreme Court elected as a matter of judicial discretion to consider an unpreserved structural constitutional claim in *Freytag v. Commissioner*, 501 U.S. at 878–79, the kind of discretion exercised in *Freytag* is unavailable when, as here, a statute establishes a mandatory issue-exhaustion requirement. No such exhaustion requirement was considered in *Freytag*. And while our court considered an unexhausted separation-of-powers issue in *Noel Canning v. National Labor Relations Board*, 705 F.3d 490 (D.C. Cir. 2013), we did so pursuant to an exception contained in the terms of the statutory exhaustion requirement itself, *id.* at 497, not by forging our own exception as a matter of judicial discretion.

With respect to judicial estoppel, because it too is a creature of judicial discretion, *see Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 797 (D.C. Cir. 2020), we doubt it can overcome a statute's mandatory exhaustion obligation. In any event, our colleague's basis for applying judicial estoppel falls short. In her view, because a Department representative argued before the Judicial Officer that he lacked authority to decide constitutional challenges, the Department should be estopped from contending that petitioners should have raised their dual for-cause-removal claim to the Officer. Dissenting Op. 12–13.

But while a Department representative did argue to the Judicial Officer that he lacked authority to decide constitutional claims, the representative also clarified that constitutional claims needed to be raised before the Officer to preserve them for judicial review. Dep't Resp. to Pet. Admin. Appeal, J.A. 247. And in any event, the Judicial Officer denied the suggestion that he lacked any authority to decide constitutional claims: he considered (and rejected) a structural constitutional claim that his appointment had been inconsistent with the Appointments Clause. *Joe Fleming*, 76 Agric. Dec. at 538. Perhaps for that reason, petitioners have not raised judicial estoppel as a basis for us to reach the merits of their unexhausted dual for-cause-removal claim.

We finally address our colleague's suggestion that, if the statute in fact incorporates an issue-exhaustion requirement, we would be obligated to dismiss the petitions for review in their entirety rather than only decline to consider the unexhausted claim. Dissenting Op. 10. That notion appears to rest on the language of the statute, which calls for exhaustion "before the person may bring an action in . . . court." 7 U.S.C. § 6912(e). There is no reason to think, though, that a failure to exhaust as to one claim precludes judicial review of any and all claims (including ones for which the exhaustion requirement has been met). For instance, in *Environmentel*, the relevant regulation similarly required exhaustion as a "condition precedent to judicial review of any [agency] action." 661 F.3d at 84 (quoting 47 C.F.R. § 1.115(k)). And while we declined to consider two issues that had not been properly exhausted, we did not then dismiss the petition for review in its entirety: instead, we otherwise reviewed the challenged order and sustained it. *Id.* at 85–86. Here, we likewise cannot consider petitioners' unexhausted dual for-cause-removal claim, but we remain free to consider any claims they properly exhausted in the agency proceedings.

18

III.

Petitioners preserved the remainder of their claims before the agency, but they fare no better in terms of obtaining additional relief from our court at this time.

Petitioners first argue that the Department's ALJs are principal officers, and that the steps the Secretary of Agriculture has taken to redress the *Lucia* problem—namely, ratifying ALJs' appointments and administering new oaths of office, *Trimble*, 77 Agric. Dec. 15, 17 (2018)—are insufficient to allow any ALJ to hear petitioners' case on remand. We disagree. The ALJs are inferior officers who can be appointed by department heads like the Secretary.

An officer of the United States is "inferior" for purposes of the Appointments Clause if her "work is directed and supervised at some level by" principal officers. *Edmond v. United States*, 520 U.S. 651, 663 (1997). Under *Edmond*, courts examine three factors in applying that test: (i) whether the officer is subject to supervision and oversight by a principal officer; (ii) whether the officer is subject to removal by a principal officer; and (iii) whether the officer has final decisionmaking authority. *See id.* at 664; *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1339 (D.C. Cir. 2012).

Applying those factors, we have little difficulty classifying the Department's ALJs as inferior officers. Although the ALJs are not removable at will by a principal officer, the analysis hardly ends there, *see, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 671–72 (1988), and the other factors point decidedly in favor of inferior-officer status. The Department's ALJs are subject to substantial oversight by the Secretary. The ALJs must

follow the Secretary's procedural and substantive regulations, as in *Edmond*. *See* 520 U.S. at 664 (relying on principal officer's "administrative oversight" over Court of Criminal Appeals Judges given his "responsibility to prescribe uniform rules of procedure" and "formulate policies" for the Court (internal quotation marks omitted)). And the ALJs' decisions may be appealed to the Judicial Officer, whom the Secretary can remove at will. *See* 7 U.S.C. § 2204-2; 7 C.F.R. §§ 1.132, 2.12.

Petitioners contend that the Judicial Officer's appellate review is insufficient to demonstrate the ALJs' inferior-officer status unless the Judicial Officer is a principal officer, because, petitioners say, an inferior officer's decisions must be subject to review by a principal officer. We do not decide whether the Judicial Officer is a principal officer (see below), but we reject petitioners' argument regardless. It is inconsistent with *Intercollegiate*, which found the officers at issue to be inferior even though they could make significant decisions without review by another officer. 684 F.3d at 1341–42. Moreover, the Secretary (a principal officer) has considerable influence over whether an ALJ's decision becomes the final decision of the agency. For one thing, the Secretary may, at his election, step in and act as final appeals officer in any case. *See* 7 C.F.R. § 2.12. For another, the Secretary may remove the Judicial Officer at will, providing the Secretary "a powerful tool for control," *Edmond*, 520 U.S. at 664. Indeed, the Supreme Court has suggested that an officer who may be removed at will by another officer is the latter's "alter ego" for constitutional purposes. *See Free Enter. Fund v. PCAOB*, 537 F.3d 667, 686 & n.1 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (collecting cases), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010). In short, the Department's ALJs are inferior officers.

Petitioners separately make two other arguments. We decline to consider either of them at this stage.

First, petitioners contend that the Judicial Officer is an improperly appointed principal officer. There is no cause for us to address that issue because the government represents that the current Judicial Officer will be recused from these cases on remand due to her prior service as the ALJ who entered the underlying default orders against petitioners. If a different ALJ rules against petitioners on remand and they wish to appeal, the government assures us that their appeals will be heard by the Secretary or another officer with properly delegated authority, not the Judicial Officer. On that understanding, we see no need to address petitioners' challenge to the Judicial Officer's appointment.

Petitioners also advance a statutory argument, contending that the agency lacks authority under the Horse Protection Act to disqualify them from events and impose civil fines in the same proceeding. We have no reason to address that argument at this stage as it does not bear on the lawfulness of the administrative process petitioners will undergo on remand. As with any of their other unresolved claims, petitioners can press it in the remaining proceedings.

\* \* \* \* \*

For the foregoing reasons, we grant the petitions for review, vacate the underlying orders, and remand to the agency for further proceedings consistent with this opinion.

*So ordered*.

RAO, *Circuit Judge,* concurring in part and dissenting in part: This appeal raises an important structural constitutional question, namely whether administrative law judges, who are Executive Branch officers exercising significant executive power, can be insulated from the Chief Executive with two layers of for-cause removal protection. The Constitution and decisions of the Supreme Court provide a clear answer: such a double layer of independence contravenes the separation of powers and undermines the democratic accountability promoted by vesting all executive power in the President.

Rather than reach this question, the majority goes to great lengths to avoid it. In the majority's view, this court is barred from considering petitioners' challenge until the agency considers it first—despite the fact the agency has steadfastly maintained it cannot consider structural constitutional challenges until *we* reach them first. The court refuses to act before the agency, while the agency refuses to act before the court—trapping petitioners in an administrative-judicial hall of mirrors. It would be one thing if the governing statute or regulations compelled this result. They do not. It abdicates our judicial responsibility to duck a properly presented and serious constitutional challenge to the structure of administrative adjudication. I would therefore reach the merits of the petitioners' challenge and hold the tenure protections for administrative law judges unconstitutional.

I.

The proceedings in this case arose under the Horse Protection Act, a statute administered by the U.S. Department of Agriculture ("USDA" or "Department") that is designed to protect show horses from abusive trainers. *See* 15 U.S.C. §§ 1821–1831. To impose civil penalties under the Act, the USDA must first provide the accused with "notice and opportunity for a hearing before the Secretary." 15 U.S.C. § 1825(b)(1). The Secretary is not, however, required to personally preside over each proceeding. Instead, agencies may

"appoint as many administrative law judges ["ALJs"] as are necessary" to conduct the hearings required by statute. 5 U.S.C. § 3105. Once appointed by the Secretary, an ALJ has a high degree of independence protected by two layers of for-cause removal restrictions. The Secretary may remove an ALJ "only for good cause established and determined by the Merit Systems Protection Board ["MSPB"]." 5 U.S.C. § 7521(a). And the members of the MSPB are removable by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

In the case before us, the USDA filed complaints alleging that petitioners "sored" Tennessee walking horses. Soring is a practice that involves deliberately injuring horses to force them to adopt a particular gait. The petitioners failed to answer the complaints in time, so the ALJ entered default orders imposing monetary sanctions and disqualifying the petitioners from horse competitions for several years. The petitioners proceeded to exhaust the available review procedures by appealing the orders to the Judicial Officer—an official who performs regulatory functions on behalf of the Secretary and reviews orders issued by the agency's ALJs. *See* 7 U.S.C. § 2204-2; 7 C.F.R. § 1.145. While the petitioners presented several constitutional challenges to the appointment of the ALJ and the Judicial Officer, they did not object to the ALJ's removal protections. The Judicial Officer, however, categorically refused to consider any constitutional challenges to the ALJ until a court addressed the merits of those challenges first. The Judicial Officer then affirmed the ALJ's orders.

The petitioners filed an appeal in this court. The appeal was held in abeyance pending the Supreme Court's resolution of *Lucia v. SEC*, which held that the ALJs of the Securities and Exchange Commission ("SEC") are officers of the United States who must be appointed in accordance with the Appointments Clause. 138 S. Ct. 2044, 2055 (2018). *See also*

U.S. Const. art. II, § 2. No party disputes that under *Lucia*, ALJs of the USDA are officers of the United States, and I agree with the majority that these ALJs are inferior officers who must be appointed by the President or the head of a department. Maj. Op. 3 (remanding for "new administrative hearings before validly appointed ALJs"). It follows that the ALJ presiding below, who was hired by agency staff, was not constitutionally appointed.

In addition to the Appointments Clause question resolved by *Lucia*, the petitioners raise several other structural constitutional challenges before this court. Most important for our purposes, they argue that the two layers of for-cause tenure protection insulating ALJs from removal are unconstitutional under *Free Enterprise Fund v. Public Company Accounting Oversight Board*. *See* 561 U.S. 477, 498 (2010) (holding that it unconstitutionally infringes the President's executive power to insulate the Public Company Accounting Oversight Board ("PCAOB") with two layers of tenure protection). The USDA asks that we vacate and remand in light of the *Lucia* error and decline to reach the removal power issue; the petitioners, on the other hand, ask that we decide the question rather than remand to a decisionmaker who would still lack the constitutional authority to preside. The agency maintains that petitioners failed to exhaust their challenge to the removal protections before the agency and should be barred from raising it in this appeal. On the merits, the government's only defense of the ALJ's double layer of tenure protections is that the term "good cause" can be construed broadly to avoid the constitutional question and to allow for a measure of presidential control that satisfies constitutional requirements.

After the parties briefed and argued the additional questions raised by the petitioners, this panel appointed an amicus to defend the position that, assuming we reject the government's construction of the "good cause" standard set out

in 5 U.S.C. § 7521(a), the double layer of for-cause protection is "nonetheless not 'incompatible with the Constitution's separation of powers' as applied to administrative law judges within the Department of Agriculture." Order at 1, *Fleming v. Dept. of Agric.*, No. 17-1246 (D.C. Cir. Dec. 6, 2019) (quoting *Free Enterprise Fund*, 561 U.S. at 498). The court ordered a new round of briefing, again heard oral argument, and has received more than forty supplemental filings.

The majority now bends over backward to avoid the constitutional challenge to the ALJ removal protections. For the reasons discussed below, I would reach the question and hold the double layer of for-cause removal protection unconstitutional.

## II.

Petitioners failed to raise their constitutional challenge to the ALJ's independence before the agency. The majority holds that the petitioners may not raise their challenge to the double for-cause removal protections on appeal until they have exhausted the issue by presenting it to the agency. I disagree: no statute, nor any regulation, mandates issue exhaustion. The relevant statute, 7 U.S.C. § 6912(e), requires that parties exhaust all available *procedures*, but nothing in its text requires that a party exhaust specific *issues* by presenting them to the agency. And the relevant regulation, 7 C.F.R. § 1.145, does not bar the petitioners' challenge because it similarly does not mandate issue exhaustion. Moreover, in light of the importance of judicial review of structural constitutional issues, our precedents strongly favor, if not require, reaching such issues even when not exhausted before an agency. Finally, the USDA should be estopped from raising its exhaustion argument. Before the agency's adjudicators, the USDA successfully argued that constitutional challenges to the ALJ must first be decided by the courts. The agency should not now be able to argue the opposite, namely that this constitutional issue must

first be decided by the agency. Exhaustion is simply not required here and therefore I would reach petitioners' substantial constitutional challenge to the ALJ removal protections.

## A.

The USDA's exhaustion statute provides that "a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against … the Department." 7 U.S.C. § 6912(e). Two aspects of this statute are particularly salient. First, we have held "that 7 U.S.C. § 6912(e) does not impose a *jurisdictional* exhaustion requirement" because it does "not contain the type of sweeping and direct language that would indicate a jurisdictional bar." *Munsell v. Dep't of Agric.*, 509 F.3d 572, 575, 580 (D.C. Cir. 2007) (quoting *Ali v. Dist. of Columbia*, 278 F.3d 1, 5–6 (D.C. Cir. 2002)). Second, Section 6912(e) does not directly require parties to exhaust specific issues by presenting them to an agency before raising them in court—the statute requires only that a party exhaust available "appeal procedures."

This language reflects a well-established distinction in administrative law between issue exhaustion, which requires that a party raise specific arguments, and exhaustion of remedies, which requires that a party seek review after exhausting the available agency procedures. *Sims v. Apfel*, 530 U.S. 103, 107 (2000). Section 6912(e) provides only for exhaustion of remedies, which is in sharp contrast to numerous statutes in which Congress has explicitly required a party to exhaust issues before an agency as a prerequisite to bringing a claim in court.[1] Section 6912(e) imposes no freestanding issue

---

[1] *See, e.g.*, 15 U.S.C. § 717r(b) ("No objection to the order of the [Federal Energy Regulatory] Commission shall be considered by the court unless such objection shall have been urged before the

exhaustion requirement for petitioners to present their removal challenge to the agency.

Because the statute alone cannot support issue exhaustion, the majority must maintain that the statute bars our review by "incorporat[ing]" issue-exhaustion requirements found in the agency's regulations. Maj. Op. 14. I agree with the majority that issue exhaustion could be required under Section 6912(e), but *only if* the agency's regulations require such exhaustion. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (holding that a statutory exhaustion requirement similar to Section 6912(e) requires "compliance with an agency's deadlines and other critical procedural rules"); *Island Creek v. Bryan*, 937 F.3d 738, 747 (6th Cir. 2019) (explaining that under a similar statute, issue exhaustion is required only if "an agency's rules so require"); *see also Sims*, 530 U.S. at 113 (O'Connor, J., concurring in part) (emphasizing that issue exhaustion is required when "a specific … regulation requir[es]" it, but not when a regulation "affirmatively suggest[s] that specific issues need not be raised"). The Department cannot prevail on exhaustion because its regulations do not mandate issue exhaustion.

The majority maintains that 7 C.F.R. § 1.145 requires that parties appeal specific issues to the Judicial Officer. Maj. Op. 8, 11–12. The plain meaning of this regulation, however, does

Commission in the application for rehearing unless there is reasonable ground for failure so to do."); *see also* 29 U.S.C. § 160(e) ("No objection that has not been urged before the [National Labor Relations] Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); 30 U.S.C. § 816(a) ("No objection that has not been urged before the [Federal Mine Safety and Health Review] Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

not include issue exhaustion as a requirement for raising issues on judicial appeal. Rather, it establishes a series of ministerial requirements for administrative appeals to the Judicial Officer. The majority primarily relies on 7 C.F.R. § 1.145(e), which states that "[a]rgument to be heard on appeal, whether oral or on brief, shall be limited to the issues raised in the appeal or in the response to the appeal, except … if the Judicial Officer determines that additional issues should be argued." 7 C.F.R. § 1.145(e). Section 1.145(e) is entirely silent with respect to judicial review—it states only that the "[s]cope of argument" before the Judicial Officer will be limited to issues raised on the parties' appeal to the Judicial Officer. Moreover, Section 1.145(e) does not require issue exhaustion, because it explicitly provides that the Judicial Officer may allow unraised issues to be argued.

Other subparts of the regulation impose various procedural rules for the administrative appeal, but no exhaustion requirement. For instance, Section 1.145(a) requires that "[e]ach issue set forth in the appeal petition [to the Judicial Officer] and the arguments regarding each issue … shall be plainly and concisely stated." 7 C.F.R. § 1.145(a). Section 1.145(b) provides for the timing and details of the response to the petition. The other provisions address such requirements as the format and timing of oral argument; appeals submitted for decision on the briefs; transmittal of briefs; and transcription of testimony. 7 C.F.R. § 1.145(c), (d), (h). The regulation simply does not create a mandatory issue exhaustion requirement, and the majority's contrary conclusion cannot be supported by the plain meaning of the regulation. Put another way, nothing in the regulation forecloses this court from excusing a failure to exhaust or from applying standard exceptions to exhaustion. *Cf. Ross v. Blake*, 136 S. Ct. 1850, 1858 n.2 (2016) (noting that some statutory exhaustion provisions "might be best read to give judges the leeway to create exceptions or to … incorporate

standard administrative-law exceptions" and that "[t]he question in all cases is one of statutory construction").

The majority largely ignores the non-mandatory terms in which 7 C.F.R. § 1.145(e) is written and instead emphasizes that the regulations "empower" the Judicial Officer "to impose forfeiture." Maj. Op. 13. Yet the majority fails to explain why such a power would be an "appeal procedure[]" that requires exhaustion under Section 6912(e). Like courts, agency adjudicators have the power to reject arguments that are not raised. *See, e.g.*, *In re Laurel Baye Healthcare of Lake Lanier*, 352 NLRB 179 at *1 n.2 (2008), *vacated on other grounds*, *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469 (D.C. Cir. 2009) ("The respondent waived this argument by failing to raise it before the [administrative law] judge."). Nonetheless, the Supreme Court has concluded some agency regulations "do not require issue exhaustion." *Sims*, 530 U.S. at 108. Thus, it is not enough that the agency has the power to rely on forfeiture. The majority must demonstrate that the agency's regulations require parties to affirmatively raise each argument they wish to preserve for judicial review. 7 C.F.R. § 1.145 does not. Instead the regulation explicitly states that a party may prevail on an argument regardless of whether it was raised.

The cases the majority relies upon cannot support its claim that the USDA's regulation requires issue exhaustion. Maj. Op. 13–14. For instance, unlike this case, *Environmentel, LLC v. FCC*, 661 F.3d 80 (D.C. Cir. 2011), involved a statute with a mandatory issue exhaustion requirement. *See* 47 U.S.C. § 405(a) ("The filing of a petition for reconsideration" shall be "a condition precedent to judicial review … where the party seeking such review … relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass."). In light of the explicit statutory exhaustion requirement, the court

easily concluded that "the full FCC must have the opportunity to review all cases and all aspects of those cases before parties may exercise their statutory right to appeal to this Court." *Environmentel*, 661 F.3d at 84.

Nor can the majority rely on *Vermont Department of Public Service v. United States*, because the court in that case did not hold that the regulations at issue imposed mandatory exhaustion. 684 F.3d 149 (D.C. Cir. 2012). Rather, it analyzed the issue under judge-made exhaustion doctrines, which give the court discretion to excuse failure to exhaust. *See id.* at 159 (Although a court "may, in its discretion, excuse exhaustion," the court "find[s] no such exculpatory circumstances here.") (quoting *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004)) (cleaned up).[2] It is the majority, then, that departs from precedent by disclaiming our discretion to excuse failures to exhaust.

Furthermore, when an agency's regulations are the basis for issue exhaustion, rather than the statute itself, arguments must be raised before the agency in the manner "appropriate under [the agency's] practice." *Woodford*, 548 U.S. at 90 (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)) (emphasis omitted). In light of the USDA's stated policy not to consider structural constitutional challenges to ALJ decisionmaking authority absent a court ruling, 7 C.F.R. § 1.145 cannot require exhaustion of this issue. *See* J.A. 372–74. Where, as here, an agency chooses not to consider a certain class of claims, the agency's procedures

---

[2] The majority's reliance on dicta in *Sims* also does not support reading 7 C.F.R. § 1.145(e) to require exhaustion. Maj. Op. 14. In *Sims*, the Court merely mentioned a different regulatory provision, 20 C.F.R. § 802.211(a), in passing as an example of issue exhaustion. 530 U.S. at 108. But *Sims* did not have occasion to interpret that regulation or the one at issue in this case.

cannot be said to require that parties exhaust those claims. To require exhaustion in such a case as a prerequisite for judicial review would be inconsistent with the underlying justifications for issue exhaustion, namely, giving the agency the chance to correct its mistakes and making judicial review more efficient. *Woodford*, 548 U.S. at 89.

Finally, the majority is unwilling to accept the full consequences of its conclusion regarding issue exhaustion. Section 6912(e) imposes a mandatory exhaustion of remedies requirement—the failure to exhaust "appeal procedures" bars a judicial action against the Department. *See* 7 U.S.C. § 6912(e) ("[A] person shall exhaust all administrative appeal procedures … before the person may bring an action in a court of competent jurisdiction."). Under the majority's determination that the agency's appeal procedures have not been exhausted, petitioners should be barred from bringing this entire "action," not merely the unexhausted claim. *See* Maj. Op. 17. The majority cannot explain how the plain meaning of the statute allows petitioners to maintain part of their suit despite failing to exhaust the regulatory appeal procedures. The majority finds the statute unyielding—but then carves out exceptions to reach some, but not all, of petitioners' constitutional claims.

B.

The majority's resolution also cannot be squared with the Supreme Court's repeated determination that structural constitutional challenges are an exception to general principles of exhaustion.[3] The failure to raise such important issues before

---

[3] The majority notably does not rely on judge-made exhaustion doctrines, which may be available "even in the absence of a statute or regulation." *Sims*, 530 U.S. at 109. By forcing issue exhaustion into a statute and regulation that do not require it, the majority avoids having to determine whether the exceptions for structural constitutional issues are available. *Ross*, 136 S. Ct. at 1857 (noting

an agency does not bar our review. Challenges to the double layer of for-cause removal protection go to the constitutional legitimacy and accountability of agency adjudication. *See Free Enterprise Fund*, 561 U.S. at 496 (explaining that a double for-cause removal limitation "impair[s]" the President's "ability to execute the laws by holding his subordinates accountable for their conduct") (cleaned up). Because petitioners' claim here is a structural constitutional challenge, it can "be considered on appeal whether or not [it was] ruled upon below." *Freytag v. Comm'r*, 501 U.S. 868, 879 (1991); *see also Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962) (noting "the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers"). As in *Freytag*, "we are faced with a constitutional challenge that is neither frivolous nor disingenuous," and the problem with two layers of for-cause removal protection "goes to the validity" of the ALJ adjudication in this case. 501 U.S. at 879.

Similarly, petitioners' challenge "implicate[s] fundamental separation of powers concerns." *Noel Canning v. NLRB*, 705 F.3d 490, 497 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014). In *Noel Canning*, this court excused exhaustion and reached the constitutional question, *id.* at 496–98, even though the Supreme Court had previously held that the relevant statute imposes a jurisdictional exhaustion requirement that deprives "the Court of Appeals [of] jurisdiction to review objections that were not urged before the Board," *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982). Moreover, in *PHH Corporation v. CFPB*, the en banc court explained that "we cannot avoid the constitutional question" regarding the removal protections for the Director of the Consumer Financial

---

that judge-made exhaustion requirements "remain amenable to judge-made exceptions"); *see also* Maj. Op. 9 ("[E]xceptions of that kind are available in the case of a judge-made exhaustion obligation.").

Protection Bureau ("CFPB"), because a remand to the CFPB for further action "necessitate[d] a decision on the constitutionality of the Director's for-cause removal protection." 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc), *abrogated by Seila Law v. CFPB*, 140 S. Ct. 2183 (2020).

Our cases reinforce the importance of resolving constitutional questions in the circumstances of this case, in which petitioners have raised serious structural constitutional claims regarding the accountability of the ALJ adjudicating their case. The issues are pure questions of law that will not benefit from further development by the agency. Moreover, the majority's remedy requires a remand to the agency, which means that like in *PHH* we cannot avoid petitioners' constitutional claims about the adjudicator they will face on remand. Therefore, it is both necessary and appropriate for us to reach petitioners' constitutional challenge to the ALJ's double layer of for-cause removal protection.

C.

Although I think neither the statute nor the regulations require issue exhaustion, even assuming with the majority that USDA's regulations create a mandatory issue exhaustion requirement, the agency should be estopped from prevailing on its exhaustion argument before this court. In this case, the petitioners are subject to regulatory requirements written, enforced, and adjudicated by the USDA; but the USDA insisted throughout the proceedings that constitutional claims must be brought first in this court. Now the agency says constitutional claims must be brought first before the agency. I would not allow the agency to duck and weave its way out of meaningful judicial review.

In an attempt to persuade the Judicial Officer not to reach several constitutional challenges to the ALJ's authority (challenges unrelated to the removal question now at issue), the

USDA argued below that its Rules of Practice—which include 7 C.F.R. § 1.145—do not apply to constitutional objections. The agency cited 7 C.F.R. § 1.131, which provides that the USDA's Rules of Practice apply only to "adjudicatory proceedings" arising under several dozen specifically enumerated statutes. According to the Department's brief before the Department's Judicial Officer, constitutional objections are not subject to the Rules of Practice because they do not arise under any of the enumerated statutes. The Department's position could not have been clearer: "[A] constitutional challenge against the ALJs and the Judicial Officer is not part of an 'adjudicatory proceeding' governed by the Rules of Practice." J.A. 247. Moreover, the Department maintained that "[t]he Department's ALJs and the Judicial Officer should continue to preside over administrative proceedings … unless and until there is a final determination by the federal courts that they lack the authority to do so." J.A. 243.

Indeed, the Judicial Officer adopted this exact reasoning and language, ruling that "administrative law judges should continue to preside over administrative proceedings … unless and until there is a final determination by the federal courts that they lack the authority to do so." J.A. 372. After successfully making its argument below, the Department does a 180 and argues to this court—and the majority agrees—that the agency's regulations require parties to exhaust structural constitutional challenges before the agency.

The government should be estopped from raising its exhaustion argument. As the majority and I agree, Section 6912 is a mandatory, but non-jurisdictional, exhaustion of remedies requirement. For us to enforce such a requirement, it must be raised by a party. Maj. Op. 10–11. But the government should not be permitted to raise its exhaustion argument. Judicial estoppel of the agency's exhaustion argument is appropriate to

prevent the agency "from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted); *see also Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 734 (D.C. Cir. 2019) ("[M]ost circuits have applied judicial estoppel in cases where the first proceeding was before an agency … and no circuit has declined to do so.") (citations omitted). Since all agree that there is no jurisdictional exhaustion requirement the court must enforce sua sponte, even a mandatory exhaustion requirement does not prohibit us from reaching the merits when the government is estopped from invoking exhaustion. Contrary to the majority's contention, Maj. Op. 16, judicial estoppel is precisely the kind of exception that even a mandatory exhaustion statute contemplates because such a statute requires exhaustion to be properly invoked by a party.

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 797 (D.C. Cir. 2010) (quoting *Maine*, 532 U.S. at 750). "[T]he circumstances under which judicial estoppel may appropriately be invoked are … not reducible to any general formulation of principle," *Maine*, 532 U.S. at 750 (citation omitted), but courts often consider three factors: (1) whether the later position is "clearly inconsistent" with the earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51 (cleaned up). These three factors are not "inflexible prerequisites or an exhaustive formula," and other "considerations may inform the doctrine's application." *Id.* at 751.

The circumstances here amply meet these factors. First, the agency's position before this court that petitioners should

have exhausted their ALJ removal argument before the agency is "clearly inconsistent" with its initial position that such structural constitutional questions must be first raised in court. J.A. 247. Second, the agency ultimately succeeded in persuading the Judicial Officer to decline to hear petitioners' constitutional challenge to the ALJ, and instead to proclaim that "challenges to the constitutionality of the [ALJs] and the administrative process should be raised in an appropriate United States Court of Appeals." J.A. 372. Finally, the agency would "derive an unfair advantage" if it is allowed to benefit from its change of position.[4] *Maine*, 532 U.S. at 751. Shifting interpretations of agency regulations always carry the risk of "creat[ing] unfair surprise or upset[ting] reliance interests." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2421 (2019); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (emphasizing the danger of unsettling reliance interests when an agency reverses position).

It would be contrary to basic principles of fairness to permit the government to prevail before this court by invoking conflicting interpretations of a regulation at different phases of the same litigation.[5] Our equitable discretion would be well

---

[4] In a similar context, the Sixth Circuit invoked judicial estoppel and permitted a suit to go forward in the district court because an agency had previously prevailed by convincing the MSPB that the suit could go forward *only* in the district court. *Valentine-Johnson v. Roche*, 386 F.3d 800, 809–11 (6th Cir. 2004). The court refused to let the agency "ma[k]e a 180-degree change in its position" by arguing that the suit could not proceed in district court because the plaintiff had failed to exhaust her administrative remedies. *Id*. at 810.

[5] After the agency argued that the Rules of Practice do not apply to constitutional arguments, it commented that parties should nonetheless preserve such arguments. J.A. 247 ("[I]t is well settled that constitutional issues should be raised in administrative proceedings, thereby preserving them for appeal."). These two

exercised to hold agencies to their word, rather than encourage them to formulate and then reformulate their legal positions to conveniently support their litigating needs.

\* \* \*

The majority approves the USDA's bait-and-switch, remanding petitioners' claims to the USDA without resolving the serious constitutional challenge to the ALJ's independence. After years of litigation, the petitioners, having already exhausted the agency's procedures once, must now return to make their constitutional arguments to an agency that has announced it will not consider constitutional arguments. Straining to avoid judicial decision, the majority places a substantial burden on petitioners, horse trainers who have the temerity to challenge the constitutionality of government procedures.

When Congress requires issue exhaustion before an administrative agency, we must stay our hand. In this case, however, nothing in the relevant statute or regulation requires exhaustion. We should reach petitioners' structural constitutional claims even though they were not raised below. *Freytag*, 501 U.S. at 878–79. Rather than send petitioners to argue before a decisionmaker who lacks the constitutional authority to preside, I would proceed to the merits.

---

propositions are consistent: regardless of whether 7 C.F.R. § 1.145(e) applies, judge-made exhaustion rules may require that parties present constitutional issues to an agency before raising them in court, at least as a general matter. *See Sims*, 530 U.S. at 109. Thus, one stray statement encouraging parties to preserve constitutional arguments for judicial review does not nullify the agency's plain and unambiguous statement that a "constitutional challenge against the ALJs … is not … governed by the Rules of Practice." J.A. 247. Having clearly stated that position below, the agency should be precluded from arguing the precise opposite on appeal.

17

III.

Under the text, structure, and original meaning of the Constitution, as well as Supreme Court precedent, it is unconstitutional to insulate Agriculture ALJs with two layers of removal protection.[6]

A.

The Constitution vests the executive power in a single person, the President. U.S. Const. art. II, § 1; *see also Seila Law*, 140 S. Ct. at 2197 ("The entire 'executive Power' belongs to the President alone."). The powers vested in the President and the unitary structure of the Executive Branch mean that the President must control execution of the laws. In order to "take care that the Laws be faithfully executed," U.S. Const. art. II, § 3, the President must be able to direct his subordinates in how the laws will be executed. Because "removal at will" is "the most direct method of presidential control," *Seila Law*, 140 S. Ct. at 2204, "the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties,'" *id.* at 2191 (quoting *Free Enterprise Fund*, 561 U.S. at 513–14). Placing the removal power squarely in the President's hands preserves "the chain of dependence," such that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." 1 Annals of Cong. 518 (1789) (statement of J. Madison).

This chain of dependence promotes democratic accountability by ensuring the President is "a single object for the jealousy and watchfulness of the people." *The Federalist*

---

[6] Petitioners do not challenge the constitutionality of a single layer of for-cause removal protection, so I do not address this issue. *See* Petitioners Supp. Br. 35 (urging this court to hold that "the USDA ALJs' dual-level-tenure-protection contravenes separation of powers").

No. 70, at 479 (Alexander Hamilton) (Cooke ed. 1961). Moreover, the removal power reinforces the independence of the Executive—the absence of such control "would undermine the separate and coordinate nature of the executive branch." Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1228 (2014). While the President can and must rely on subordinates, the power to remove those subordinates is a "structural protection[] against abuse of power" that is "critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

The President's removal power derives from the text and structure of the Constitution and "has long been confirmed by history and precedent." *Seila Law*, 140 S. Ct. at 2197.[7] Debates in the First Congress, the so-called Decision of 1789, made clear that the President is vested with plenary removal power. The view that "prevailed" in the First Congress "as most consonant to the text of the Constitution" was that the Article II executive power necessarily includes the power to remove subordinate officers, because anything traditionally considered to be part of the executive power "remained with the President" unless "expressly taken away" by the Constitution. Letter from James Madison to Thomas Jefferson (June 30, 1789).

---

[7] *See generally* Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 796 n.556 ("Most members of [the First] Congress recognized that forbidding removal effectively would preclude presidential control of law execution and destroy presidential accountability for that task."); Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Law*, 104 Yale L.J. 541, 597 (1994) ("[S]tructural reasons and a host of historical and textual arguments persuade us that the President must also have a removal power so that he will be able to maintain control over the personnel of the executive branch.").

19

The Supreme Court has repeatedly returned to that original meaning in recognizing that "[s]ince 1789, the Constitution has been understood to empower the President to keep … officers accountable—by removing them from office, if necessary." *Free Enterprise Fund*, 561 U.S. at 483; *see also Bowsher*, 478 U.S. at 723–24 (observing that the Decision of 1789 is "weighty evidence" of the scope of the removal power) (citation omitted); *Myers v. United States*, 272 U.S. 52, 111–36 (1926) (discussing the Decision of 1789 at length); *Ex parte Hennen*, 38 U.S. 230, 259 (1839) (noting that the First Congress's understanding became the "settled and well understood construction of the Constitution"). Consistent with this original public meaning, the Supreme Court has emphasized that the executive power vested in the President includes nearly unfettered power to remove officers of the Executive Branch.

Moreover, the Court has recognized only two judicially created exceptions to the general constitutional requirement of "the President's unrestricted removal power." *Seila Law*, 140 S. Ct. at 2192. These exceptions "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* at 2199–2200 (quoting *PHH Corp.*, 881 F.3d at 196 (Kavanaugh, J., dissenting)). First, the Court has held that Congress may "create expert agencies led by a *group* of principal officers removable by the President only for good cause." *Id.* at 2192 (citing *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)). Second, the Court has held that Congress may provide limited "tenure protections to certain *inferior* officers with narrowly defined duties." *Id.* (citing *Morrison v. Olson*, 487 U.S. 654 (1988), *United States v. Perkins*, 116 U.S. 483 (1886)). The Supreme Court recently declined to elevate these exceptions "into a freestanding invitation for Congress to impose additional restrictions on the

President's removal authority." *Seila Law*, 140 S. Ct. at 2206 (cleaned up).

Of particular relevance to petitioners' challenge is *Free Enterprise Fund*, in which the Court explained that "Congress cannot limit the President's authority" by imposing "two levels of protection from removal for those who nonetheless exercise significant executive power." 561 U.S. at 514. That case involved members of the PCAOB, who could be removed by the SEC only "for good cause shown." 15 U.S.C. § 7211(e)(6). Commissioners of the SEC, the Court assumed, could be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office." *Free Enterprise Fund*, 561 U.S. at 487 (quoting *Humphrey's Executor*, 295 U.S. at 620). Thus, two layers of for-cause removal protections insulated members of the PCAOB from presidential control.

The Court held that this "novel structure does not merely add to the Board's independence, but transforms it." *Id.* at 496. "Without the ability to oversee the Board, or to attribute the Board's failings to those whom he *can* oversee, the President is no longer the judge of the Board's conduct. … He can neither ensure that the laws are faithfully executed, nor be held responsible for a Board member's breach of faith." *Id.* Refusing to sanction innovative intrusions on the President's removal authority, the Court held that the independence created by a double layer of tenure protection was unconstitutional.

The Constitution's vesting of executive power in a single President, the structure of separate and independent powers, and longstanding Supreme Court precedent confirm that the President has broad power to remove executive officers. The Court has also reaffirmed that any judicially created exceptions to the removal power must be construed narrowly in light of the President's constitutional responsibility to execute the law.

B.

Under this framework, the "dual for-cause limitations on the removal" of ALJs "contravene the Constitution's separation of powers." *Free Enterprise Fund*, 561 U.S. at 492.

First, ALJs are officers of the United States. As the government concedes and the majority agrees, this conclusion follows from the Court's decision in *Lucia*, because Agriculture ALJs are materially indistinguishable from SEC ALJs. For example, Agriculture ALJs have extensive control over hearings, including the authority to issue subpoenas, take and order depositions, admit or exclude evidence, and rule upon motions. 7 C.F.R. § 1.144(c). The ALJ's decision becomes final absent an appeal. *Id.* § 1.142(c)(4), § 2.27(a)(1). Agriculture ALJs also have career appointments, 5 C.F.R. § 930.204(a), pursuant to an authorizing statute, *see* 5 U.S.C. § 3105. Since *Lucia*, no appellate court has found that a particular agency's ALJs are not officers. *See Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 679 (6th Cir. 2018) (extending *Lucia* to apply to Social Security Administration ALJs). *See also* U.S. Dep't of Justice, Memorandum: Guidance on Administrative Law Judges after *Lucia v. SEC* (S. Ct.) (2018) at 2 ("[W]e conclude that all ALJs and similarly situated administrative judges should be appointed as inferior officers under the Appointments Clause."). Following *Lucia*, Agriculture ALJs are inferior Executive Branch officers.

Second, as "Officers of the United States," ALJs exercise the Article II executive power on behalf of the President. To be sure, ALJs perform adjudicative functions and use adjudicatory procedures to execute the law. *See* 7 C.F.R. § 1.141. Whatever methods or functions are employed, however, officers of the Executive Branch cannot exercise anything but executive power:

> The [legislative power] is vested exclusively in Congress, the [judicial power] in the "one supreme Court" and "such inferior Courts as the Congress may from time to time ordain and establish." Agencies make rules … and conduct adjudications … and have done so since the beginning of the Republic. These activities take "legislative" and "judicial" forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the "executive Power."

*City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (citations omitted); *see also Freytag*, 501 U.S. at 912 (Scalia, J., concurring in part) ("[T]he Tax Court, like the Internal Revenue Service, the FCC, and the NLRB, exercises executive power."). [8] As Congress lacks the power to delegate to Executive Branch officers either the legislative power, *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001), or the judicial power, *Stern v. Marshall*, 564 U.S. 462, 484 (2011), ALJs can exercise neither. *See also Seila Law*, 140 S. Ct. at 2216 (Thomas, J., concurring in part and dissenting in part) (explaining that Congress cannot "create agencies that straddle multiple branches of Government … [f]ree-floating

---

[8] Justices of the Supreme Court who disagree about the permissible restrictions on the President's removal power agree that the heads of independent agencies exercise executive power, even when they adjudicate or enact regulations. *See Free Enterprise Fund*, 561 U.S. at 514 (observing that PCAOB members with adjudicatory functions "exercise significant executive power"); *id.* at 516 (Breyer, J., dissenting) (framing the question as the President's power to dismiss "executive Branch officials"); *see also Seila Law*, 140 S. Ct. at 2234 n.7 (Kagan, J., concurring in part and dissenting in part) (disagreeing with the majority regarding the scope of the removal power but noting that "today we view *all* the activities of administrative agencies as exercises of the executive power") (cleaned up).

agencies simply do not comport with [the] constitutional structure").

Third, while "Congress may afford the officers of [Executive Branch adjudicative bodies] a measure of independence from other executive actors … they remain Executive–Branch officers subject to presidential removal." *Kuretski v. Comm'r*, 755 F.3d 929, 944 (D.C. Cir. 2014). As officers exercising the executive power, Agriculture ALJs must be accountable to the President. To secure the requisite constitutional accountability, officers must be in the chain of command to the President, with control generally provided by removal at will. *See Seila Law*, 140 S. Ct. at 2191.

Yet despite being Executive Branch officers wielding the executive power on behalf of the President, Agriculture ALJs are not subject to the President's control, either directly or through the Secretary of Agriculture. Congress insulated ALJs with two layers of for-cause removal protection: an agency may remove an ALJ "only for good cause established and determined by the [MSPB]," 5 U.S.C. § 7521(a), and members of the MSPB "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 1202(d).

ALJs have not always enjoyed such double layered independence. Prior to 1946, ALJs enjoyed no tenure protections at all and "were in a dependent status" vis-à-vis their agency. *Ramspeck v. Fed. Trial Exam'rs Conf.*, 345 U.S. 128, 130 (1953). The Administrative Procedure Act ("APA") in 1946 first provided that ALJs may be removed only for good cause, a development designed to promote "independence and tenure within the existing Civil Service system." *Id.* at 132. Congress ensured ALJs were "removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission." Administrative Procedure Act, Pub. L. No 79-404, § 11, 60 Stat. 237 (1946).

The members of the Civil Service Commission, however, were removable at will by the President. *See* 5 U.S.C. § 632 (1946) ("The President may remove any Commissioner."). So ALJs were protected by a single for-cause removal restriction.

It was not until 1978 that Congress established the Merit Systems Protection Board, the members of which can be removed only for cause, to replace the Civil Service Commission. *See* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 1202(d), 92 Stat. 1111. These amendments also placed ALJs within the control of the MSPB, creating the double layer of for-cause removal protection. Thus, the double layered independence for ALJs is a relatively recent innovation. *Cf. Seila Law*, 140 S. Ct. at 2202 ("The CFPB's single-Director structure is an innovation with no foothold in history or tradition.").

When the two for-cause removal restrictions are combined, neither the President nor the Secretary has any meaningful power to remove ALJs from office—for any reason, much less for "simple disagreement with [their] policies or priorities." *Free Enterprise Fund*, 561 U.S. at 502. Because adjudication is the sole mechanism by which the USDA can execute statutes like the Horse Protection Act, *see* 15 U.S.C. § 1825(b)(1), an ALJ's double layer of independence deprives the President of any effective control over enforcement of such statutes. The two layers insulating Agriculture ALJs from removal are materially identical to the two layers that protected members of the PCAOB—an ALJ may be removed only for cause by a Board whose members may be removed only for cause.[9] This is an unconstitutional infringement of the President's executive power.

---

[9] In *Free Enterprise Fund*, the Supreme Court explicitly stated that it was "*not* address[ing]" the question of the constitutionality of double layer removal protections for ALJs. 561 U.S. at 507 n.10

While the Court has recognized that an inferior officer may be insulated from removal in some circumstances, *see Seila Law*, 140 S. Ct. at 2199 (citing *Morrison*, 487 U.S. at 662–63, 696–97), that narrow exception to the President's removal power does not extend to two layers of for-cause tenure protection. A second layer of for-cause protection "contravene[s] the Constitution's separation of powers," because it results in officers who are "not accountable to the President, and a President who is not responsible for" his officers. *Free Enterprise Fund*, 561 U.S. at 492, 495.

Under the double tenure protection in Section 7521(a), the Secretary cannot remove an ALJ who fails to follow the policy directives of the agency—the "second layer matters precisely when the President finds it necessary to have a subordinate officer removed, and a statute prevents him from doing so." *Id.* at 497 n.4. This limitation on the President's oversight of the execution of the laws "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Id.* at 498. Thus, statutory insulation of ALJs with two layers of for-cause removal protection impedes the President's control over execution of the laws and violates the Constitution's structure of separate and independent powers.

## C.

The government and court-appointed amicus raise a number of arguments in support of removal protections for

---

(emphasis added). The Court later said in *Lucia* that "[n]o court has addressed th[e] question" of whether an ALJ's tenure protections are constitutional, explicitly leaving the question open once again. 138 S. Ct. at 2050 n.1. Court-appointed amicus is therefore mistaken in asserting that the Court exempted ALJs from its holding in *Free Enterprise Fund*. *See* Appointed Amicus Rep. Br. 2. The open question is squarely presented in this case.

Agriculture ALJs. They focus primarily on the ALJ's adjudicatory role and scope of responsibility, as well as the Secretary's remaining oversight powers. At root, these arguments assume that ALJs are categorically different from other Executive Branch officers. Yet such a principle is incompatible with the Constitution and recent Supreme Court decisions. As the Court recognized in *Lucia*, ALJs are "officers" for the purposes of the Appointments Clause. 138 S. Ct. at 2049, 2054. They must therefore be "officers" for the purposes of the President's removal power. The principle of "adjudicatory independence" pressed by amicus is explicitly protected in the Constitution by the life tenure and irreducible salaries guaranteed to Article III judges, *see* U.S. Const. art. III, § 1; however, any principle of adjudicatory independence for ALJs must be understood in the context of executive power exercised within the Executive Branch. In that context, the President has the constitutional power and responsibility for overseeing execution of the laws, a power generally backed by the threat of removal. Any insulation Congress creates for agency adjudication must be compatible with the Constitution's vesting of all executive power in the President.

Neither the government nor the court-appointed amicus demonstrates how two layers of for-cause removal protections for ALJs are compatible with the Constitution and the Supreme Court's precedents confirming the centrality of the President's removal authority to the separation of powers.

1.

Dodging the constitutional question, the government insists that we can and must interpret the double for-cause removal protection in Section 7521(a) to avoid running afoul of Article II. To reach this result, the government maintains that the "good cause" standard can be read to allow removal of ALJs for "misconduct, poor performance, or failure to follow lawful directions, but not for reasons that are invidious or

otherwise improper in light of their adjudicatory function," and that such a reading would be sufficient to protect the President's executive power. Gov't Supp. Br. 31.

The Supreme Court, however, has repeatedly declined to read statutory removal restrictions contrary to their conventional and longstanding meaning, a meaning that includes a measure of independence from policy direction. As the Court has explained, "removal restrictions set forth in the statute mean what they say," and for-cause provisions generally do not permit removal based on "simple disagreement with … policies or priorities." *Free Enterprise Fund*, 561 U.S. at 502. In *Seila Law*, the Court likewise rejected constructions of "good cause" to allow for greater presidential control, because "we take Congress at its word that it meant to impose a meaningful restriction on the President's removal authority." 140 S. Ct. at 2207; *see also id.* at 2206 (noting that the government's saving construction would conflict with *Humphrey's Executor*, which "implicitly rejected an interpretation that would leave the President free to remove an officer based on disagreements about agency policy"); *Free Enterprise Fund*, 561 U.S. at 503 n.7 (finding the government's construction of good cause "implausibl[e]"); *PHH Corp.*, 881 F.3d at 191 n.16 (Kavanaugh, J., dissenting) ("[F]or-cause removal restrictions attached to independent agencies ordinarily prohibit removal except in cases of inefficiency, neglect of duty, or malfeasance.").[10]

---

[10] Moreover, the MSPB's assessments of good cause in ALJ removal proceedings are reviewed by the Federal Circuit, which, like the Supreme Court, has maintained that the good cause standard does not permit removal based only on policy disagreements. *See Berlin v. Dep't of Labor*, 772 F.3d 890, 894 (Fed. Cir. 2014) (holding that an agency may not remove an ALJ if it would "constitute an improper interference with the ALJ's performance of his quasi-judicial

The government also fails to provide any criteria for separating what it considers "legitimate reasons" for removal from the invidious ones. Gov't Supp. Br. 32. *Cf. Seila Law*, 140 S. Ct. at 2206 (noting that the CFPB's defenders failed to articulate "any workable standard derived from the statutory language" for their interpretation of good cause). The government's ahistorical and unconventional interpretation would create substantial uncertainty about the degree of permissible presidential control of ALJs and run afoul of the separation of powers. Enforcing the President's constitutional power of removal through case-by-case statutory interpretation would leave courts to make the ultimate assessment of "good cause" for removal. Such a scheme would undermine the President's independent constitutional authority to ensure faithful execution of the law by controlling and directing his subordinates.

Thus, I would reject the government's attempt to reconstruct "good cause" removal protections in a manner contrary to longstanding Supreme Court precedent. The double for-cause removal protection is not amenable to an interpretation that allows us to avoid the constitutional question.

2.

The court-appointed amicus argues that two layers of for-cause removal protection are constitutional because "removal protections for Executive Branch officials with adjudicatory roles have become firmly ensconced in constitutional law." Appointed Amicus Br. 7. This claim, however, relies on an outdated distinction between adjudication and other executive

---

functions") (citing *Brennan v. Dep't of Health & Human Servs.*, 787 F.2d 1559, 1563 (Fed. Cir. 1986)).

functions in order to justify restrictions on the President's removal power.

While *Humphrey's Executor* upheld removal restrictions for a so-called independent agency exercising "quasi-legislative" and "quasi-judicial" functions, 295 U.S. at 629 (1935) (cleaned up), the Supreme Court has repudiated this reasoning. In *Morrison v. Olson*, for example, the Supreme Court explicitly departed from its earlier reliance "on the terms 'quasi-legislative' and 'quasi-judicial' to distinguish the officials involved":

> [T]he determination of whether the Constitution allows Congress to impose a "good cause"-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as "purely executive." The analysis contained in our removal cases is designed … to ensure that Congress does not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II.

487 U.S. at 689–90. Whatever an official's functions may be, "the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Id.* at 691; *see also Seila Law*, 140 S. Ct. at 2216 (Thomas, J., concurring in part and dissenting in part) (explaining that "the Court's premise [in *Humphrey's Executor*] was entirely wrong" because "[t]he Constitution does not permit the creation of officers exercising 'quasi-legislative' and 'quasi-judicial powers' in 'quasi-legislative' and 'quasi-judicial agencies'").

In line with this reasoning, the Court has invalidated for-cause removal limitations for executive officers who perform judicial functions. It struck down the double layer of removal protection for members of the PCAOB because they were executive officers, despite their judicial functions. *See Free Enterprise Fund*, 561 U.S. at 498. Similarly, the Court invalidated the removal restrictions for the Director of the CFPB, irrespective of his adjudicatory functions. *Seila Law*, 140 S. Ct. at 2193 (detailing the CFPB's "extensive adjudicatory authority").

Admittedly, the ALJs at issue here have only adjudicatory functions, whereas the CFPB Director and the members of the PCAOB performed adjudicatory as well as other functions. *See* Appointed Amicus Br. 4; Appointed Amicus Rep. Br. 12. Yet this makes no constitutional difference. The Court has emphasized that officers exercise the executive power, irrespective of what functions they perform. *See Freytag*, 501 U.S. at 901, 907 (Scalia, J., concurring in part) (contending that the Tax Court, despite having exclusively adjudicatory functions, is an executive "department," the head of which is "answerable to the President"). Moreover, even if some for-cause limitations on removal of ALJs may fit under the exception for inferior officers in *Morrison*, a question not presented here, the arguments raised by amicus regarding "adjudicatory independence" cannot justify a *double layer* of removal protection, which the Supreme Court specifically held unconstitutional in *Free Enterprise Fund*.

The cases reinforce that regardless of their particular functions—adjudication, rulemaking, prosecution, etc.—officers within the Executive Branch exercise the executive power. The President or someone directly accountable to him must have the power to control officers executing the law, and ALJs are no exception.

3.

The court-appointed amicus also argues that two layers of for-cause removal protection are acceptable because Agriculture ALJs "do not wield expansive enforcement or policymaking powers." Appointed Amicus Br. 24. This argument just reframes the previous argument—namely, because ALJs are not exercising traditional executive functions, they may be insulated from the President's control. Even on functionalist grounds, however, amicus is mistaken.

As the Supreme Court noted in *Lucia*, ALJ adjudication *is* an enforcement power. 138 S. Ct. at 2049 (explaining that ALJ adjudication is simply "one way" agencies "enforce the nation's … laws"). In enforcing the law, ALJs play a substantial role in formulating an agency's policy. While ALJs cannot promulgate department-wide regulations, they nonetheless "determine, on a case-by-case basis, the policy of an executive branch agency." *Sec'y of Educ. Rev. of ALJ Decisions*, 15 Op. O.L.C. 8, 15 (1991). Moreover, as the Court has recognized, ALJs have "significant discretion" when exercising their "important functions." *Lucia*, 138 S. Ct. at 2053 (citing *Freytag*, 501 U.S. at 882).

In particular, the Horse Protection Act requires ALJs, who act on behalf of the Secretary, to make discretionary decisions that necessarily implicate policy determinations. For instance, in determining the size of a monetary penalty, Agriculture ALJs must weigh subjective factors such as the "nature, circumstances, extent, and gravity of the" offense at issue. 15 U.S.C. § 1825(b)(1). The ALJs must then evaluate the accused's "degree of culpability, any history of prior offenses, ability to pay, [the punishment's] effect on ability to continue to do business, and such other matters as justice may require." *Id.* The ALJs also have broad discretion to disqualify horse trainers from their occupation. *Id.* § 1825(c). Because ALJs have such wide discretion to determine violations of the law

and craft penalties—penalties that the Department may have to defend in court as appropriate and legal executions of the law—their deliberations necessarily include sensitive policy decisions. Contrary to amicus' representations, such policymaking discretion, in which an officer must choose between a range of lawful options, is an exercise of executive power and therefore must be subject to the President's control.

At bottom, however, the Constitution does not separate functions, but powers. Amicus' arguments thus fail for a fundamental reason. ALJs are executive officers exercising an aspect of the executive power vested in the President. Yet an ALJ's discretion is insulated from the supervision of both the President and the Secretary of Agriculture. If the Secretary disagrees with an ALJ's policy preferences—for instance, if he thinks the ALJ routinely imposes overly harsh, or insufficiently harsh, penalties—the double layer of for-cause removal protection means that the Secretary has virtually no power to remove the ALJ and replace him with an officer willing to carry out the administration's policy preferences. Indeed, according to the court-appointed amicus, one of the primary benefits of tenure protections is to block the Secretary from removing "an ALJ for failure to render a decision favoring the agency's policy positions." Appointed Amicus Br. 16. This naturally raises the question, whose policy positions should the ALJ promote if not the agency for which he works?

No one questions that ALJs have an obligation to follow the law, but discretionary decisions implicating agency policy cannot be doubly insulated from democratic control without transgressing the vesting of executive power in the President and the Constitution's careful separation of powers.

4.

The court-appointed amicus also minimizes the independence of Agriculture ALJs by focusing on the

Secretary's other oversight tools. First, the amicus notes that because the Secretary has the statutory authority to preside over each case himself, he need not use ALJs in the first place. *See* 15 U.S.C. § 1825(b)(1). Second, the Secretary has the power to review ALJ decisions de novo—a responsibility he has delegated to the agency's Judicial Officer. *See* 7 U.S.C. § 2204-2; 7 C.F.R. § 1.145.

These oversight mechanisms cannot compensate for the loss of control that follows from the double restraints on the removal power. Amicus' arguments minimizing the importance of ALJ authority and independence cannot be reconciled with *Lucia*, which held that ALJs are "officers" of the United States, meaning that by definition they exercise significant authority under the laws of the United States. Specifically, the Court concluded that ALJs in the SEC wield "significant authority" in executing the law even though the Commissioners, like the Secretary, are free to review and reverse decisions by ALJs. *Lucia*, 138 S. Ct. at 2052–54. The Court emphasized the fact that an ALJ's decision can become final if the "SEC declines review," an important "last-word capacity." *Id.* at 2054. The same is true of decisions rendered by Agriculture ALJs. *See* 7 C.F.R. § 2.27(a)(1) (providing that "decisions shall become final" unless appealed to the Secretary). ALJs wield meaningful, independent power despite existing forms of oversight.

The decisions of Agriculture ALJs may be countermanded by other officers, but that is not sufficient to place ALJs within the chain of command to the President. De novo review by the Secretary or Judicial Officer cannot replace control through the removal power. As the Supreme Court recognized in *Free Enterprise Fund*, "[b]road power over Board functions is not equivalent to the power to remove Board members." 561 U.S. at 504. The constitutionally required control cannot be exercised through micromanaging the ALJ's activities, or even

by promulgating regulations to govern or limit the ALJ's discretion. *Id.* Control over subordinates can be practically exercised in a variety of ways, but the removal power is the necessary constitutional minimum because it recognizes that the President sets the policies of the Executive Branch and remains accountable to the people for ensuring that his officers follow those policies. *See, e.g.*, *Myers*, 272 U.S. at 117 (concluding that the removal power is "essential to the execution of the laws"); *id.* at 245 (Brandeis, J., dissenting) (concluding that the "ability to remove a subordinate executive officer" is "essential [to] effective government").

Removal creates the proper chain of command. Proper supervision of ALJs cannot mean that the Secretary of Agriculture must adjudicate or review every case under the Horse Protection Act and countless other statutes. "[T]he various 'bureaucratic minutiae' a President might use to corral agency personnel [are] no substitute for at will removal." *Seila Law*, 140 S. Ct. at 2207 (quoting *Free Enterprise Fund*, 561 U.S. at 500); *see also Bowsher*, 478 U.S. at 726 ("Once an officer is appointed, it is only the authority that can remove him … that he must fear and, in the performance of his functions, obey.") (cleaned up). While the Secretary has some mechanisms to oversee the ALJs, such limited checks cannot provide the essential democratic accountability that follows from being removable at will.

5.

Finally, the court-appointed amicus argues that "[d]isposing of safeguards for ALJ adjudicatory independence would raise serious due process concerns." Appointed Amicus Br. 17. The scope of due process protections, however, must be understood in light of the particular context of Executive Branch adjudication. Outside Article III courts, the balancing test in *Mathews v. Eldridge* governs "what process is due." 424 U.S. 319, 349 (1976). The Supreme Court has explained that

"due process is flexible and calls for such procedural protections as the particular situation demands." *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972); *see also UDC Chairs Chapter, Am. Ass'n of Univ. Profs. v. Bd. of Trustees of Univ. of Dist. of Columbia*, 56 F.3d 1469, 1472 (D.C. Cir. 1995) (quoting *Morrisey*, 408 U.S. at 483); William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev 1511, 1521 (2020) (explaining that "[b]oth judicial and executive bodies can engage in the procedure of adjudication, but they do so pursuant to different kinds of power"). As amicus properly recognizes, "the requirements of due process in administrative adjudication are not identical to those applicable to Article III judges." Appointed Amicus Br. 18.

Whatever the scope of such administrative due process requirements, they are not undermined through adjudication by a politically accountable officer. Administrative adjudication has historically been undertaken by heads of agencies and administrative law judges who were removable at will. In this case, Congress vested the power to adjudicate cases under the Horse Protection Act in the Secretary of Agriculture, who is of course removable at will by the President. Amicus defends the ALJ removal protections by relying on the fact that the Secretary can lawfully preside over USDA hearings. Yet if the Secretary can preside, it cannot violate due process for the presiding ALJ to also be subject to removal at will (or to be protected by only one layer of for-cause removal protection). Furthermore, prior to the APA's enactment, the removal and promotion of administrative adjudicators were "determined by the ratings given them by the agency." *Ramspeck*, 345 U.S. at 130. The lack of adjudicatory independence prior to the APA, however, posed no constitutional problems. *See Marcello v. Bonds*, 349 U.S. 302, 311 (1955) (holding that it does not violate due process to have an adjudicator who is "subject to the supervision and control of officials in the Immigration Service charged with investigative and prosecuting

functions"). Even after the APA's enactment, three decades elapsed before ALJs were afforded a *double layer* of for-cause protection from removal.

Generalized claims of due process for administrative adjudication cannot overcome the constitutional requirement that the President must have the power to control officers who execute the law and to remove them if necessary. That principle applies with equal force to ALJs who execute the law through adjudication.

\* \* \*

The law is clear: "[T]ext, first principles, the First Congress's decision in 1789, [and precedent] all establish that the President's removal power is the rule, not the exception." *Seila Law*, 140 S. Ct. at 2206. The double layer of for-cause removal protection insulating the Agriculture ALJs violates the Constitution's separation of powers. Officers executing the law must be accountable to the President and, through this chain of command, to the people. I would therefore hold 5 U.S.C. § 7521(a) unconstitutional as applied to ALJs within the USDA.

## IV.

The final issue is remedial—how much of the statute to hold unconstitutional and what relief to provide to the petitioners. When holding a statute unconstitutional, we should "refrain from invalidating more of the statute than is necessary." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (citation omitted); *see also Seila Law*, 140 S. Ct. at 2209 (finding the statute's "provisions are capable of functioning independently," and therefore invalidating only the removal restrictions while leaving the rest of the statute intact); *id.* (explaining that without the removal restrictions, "the constitutional violation would disappear").

Because petitioners challenged only the constitutionality of two layers of removal protection, I would go no further than to invalidate one of the for-cause removal limits. The most straightforward way to accomplish this result is to hold the statute unconstitutional insofar as it requires the MSPB to determine whether there is good cause to remove the ALJ—the provision stating that cause will be "established and determined by the [MSPB] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a). This would leave one layer of for-cause protection—the Secretary alone would be responsible for determining whether there is good cause to remove an ALJ. This holding would cure the constitutional defect identified by *Free Enterprise Fund* because it eliminates the double for-cause framework insulating an executive officer from oversight.[11]

Section 7521(a) is unconstitutional as applied to the Agriculture ALJs, and therefore the orders against the petitioners must be vacated. Remand to the agency for further proceedings must be to a properly appointed ALJ, as the majority holds, and also to an ALJ not subject to a double layer of for-cause removal protection.[12]

---

[11] I do not address the constitutionality of any other language in Section 7521(a), including whether it is constitutional for the statute to provide that the Secretary may remove an ALJ "only for cause"— i.e., whether a single layer of for-cause removal protection is constitutional.

[12] One potential complication with a remand is that if the Secretary removes an ALJ, the ALJ could seek judicial review in the U.S. Court of Federal Claims. 28 U.S.C. § 1491(a). That court's decisions are reviewed by the Federal Circuit, *see* 28 U.S.C. § 1295(a)(3), which, in turn, is not bound by this court's precedents and could reach a different conclusion about the lawfulness of Section 7521(a). For practical purposes, then, ALJs could remain protected by the dual layer despite a decision from this court holding such a scheme

38

&#42;   &#42;   &#42;

The majority allows the government to argue before the agency that constitutional questions should be left to the courts and then argue before this court that constitutional questions should be left to the agency. We should not allow the agency to have its cake and eat it too. The petitioners properly presented their constitutional challenge to this court, and no rule of law requires that the argument be presented to the agency first. In the wake of *Seila Law*, *Free Enterprise Fund*, and *Lucia*, there can be no doubt that Agriculture ALJs enjoy an unconstitutional degree of freedom from oversight. Insulating ALJs with two layers of tenure protection dissipates the executive power and runs afoul of separation of powers. Petitioners should not have to relitigate their claims before an agency adjudicator who lacks the requisite constitutional accountability. I respectfully dissent.

---

unconstitutional. This issue was not briefed by the parties, and it is unnecessary to opine on such hypotheticals here.